## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| PERFECTLY PRISCILLA, LLC, | : | Chapter 11 Case No. 23-70575-JTL |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |
| PERFECTLY PRISCILLA, LLC, | : | |
| | : | |
| Movant, | : | Contested Matter |
| | : | |
| vs. | : | |
| | : | |
| SHOPIFY CAPITAL, INC. AND | : | |
| UNITED STATES SMALL BUSINESS | : | |
| ADMINISTRATION, | : | |
| | : | |
| | : | |
| Respondents. | : | |
| | : | |

**MOTION FOR AN ORDER: (A) AUTHORIZING AND APPROVING DEBTOR'S POST CONFIRMATION SALE OF CERTAIN PERSONAL PROPERTY PURSUANT TO 11 U.S.C. § 363 AND F.R.B.P. 6004 FREE AND CLEAR OF LIENS, CLAIMS, AND INTERESTS; (B) DETERMINING THE VALUE OF PROPERTY SECURING LIENS AND FIXING AMOUNT OF RESULTING LIENS UNDER 11 U.S.C. § 506(a) AND F.R.B.P. 3012; AND (C) GRANTING OTHER RELIEF**

COMES NOW Perfectly Priscilla, LLC, Debtor and Debtor-In-Possession in the above-named Chapter 11 Bankruptcy Case, (the "**Debtor**" or "**Movant**"), by and through its counsel of record, and files the above-captioned sale motion pursuant to 11 U.S.C. §§ 363, 506,  and F.R.B.P. 2002, 3012, 6004, and 9014 (the "**Motion**") and, in support thereof, respectfully shows this Court the following:

### I. BACKGROUND, PARTIES, JURISDICTION, AND VENUE

1.     On June 9, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for reorganization under Subchapter V of Chapter 11 of the United States Bankruptcy Code.

2.     Jenny Walker was appointed as the Subchapter V Trustee.

3.     Respondent Shopify Capital, Inc. ("**Shopify**") is a California-based lender specializing in start-up and working capital for small businesses, with a primary focus on online businesses. Shopify may claim an interest in the Property (as defined below) by virtue of On April 6, 2020, Shopify filed UCC No. 038-2020-006693 (the "**Shopify UCC**"). Upon information and belief, Shopify may be served at its principal office located at 33 New Montgomery Street, Suite 750, San Francisco, California, 94105-00. Additionally, Shopify may be served by service upon the attorney known to represent it in this case Jeffrey T. Kucera at K & L Gates, LLP, 200 S. Biscayne Blvd., Suite 3900, Southeast Financial Center, Miami, Florida 33131.

4.     Respondent United States Small Business Administration is an administrative agency of the government of the United States of America.  Respondent United States Small Business Administration (the "**SBA**") may be served at (i) U.S. Small Business Administration, 2 North Street, Suite 320, Birmingham, Alabama 35203, (ii) Disaster Assistance Administration, 1495 Kingsport Road, Forth Worth, Texas; (iii) U.S. Attorney General, c/o Merrick Garland, Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, D.C. 20530-0001; and (iv) C. Shanelle Booker, Acting United States Attorney for the Middle District of Georgia, Attn: Barbara Parker, Assistant United States Attorney P.O. Box 1702, Macon, Georgia 31202-1702.

5.     The SBA may claim an interest in the Property by virtue of a UCC Financing Statement No. 038-2020-009435 filed by SBA on May 8, 2020 (the "**SBA UCC**").

6.     This Motion constitutes a Contested Matter under F.R.B.P. 9014.

7.      Jurisdiction over this matter and over the Respondents is proper in the United States Bankruptcy Court for the Middle District of Georgia, Valdosta Division pursuant to 28 U.S.C. § 1334, 11 U.S.C. § 363, 11 U.S.C. § 506 and F.R.B.P. 2002, 3012, 6004, and 9014.

8.      Venue in this matter is proper in the United States Bankruptcy Court for the Middle District of Georgia, Valdosta Division pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      This Contested Matter is a core proceeding and may be heard and determined by this Court pursuant to 28 U.S.C. § 157(b)(1) and § 157(b)(2)(A), (K), (M), (N), and (O). The statutory predicates for the relief sought herein are 11 U.S.C. § 363 and F.R.B.P. 2002, 3012, 6004, and 9014.

10.     On November 15, 2023, the Court entered an order confirming Debtor's Chapter 11 Plan (Dkt. No. 96).

11.     Debtor's plan was a non-consensual plan under 11 U.S.C. 1191(b).

12.     Following confirmation of the Debtor's plan, its business continued to deteriorate to the point where the business was forced to shut its doors.

13.     Although it was shut down, the Debtor pursued a sale process to gage market interest in purchasing Debtor as a going concern.

14.     To that end, on or about January 20, 2025, Debtor entered into a contract with Avenue Shops, LLC, for the purchase of substantially of the Debtor's working assets, including its proprietary customer database, marketing materials, website, and online store (the "**Property**"). The terms of the proposed transaction are set forth in further detail in the contract attached as Exhibit A to this Motion (the "**Contract**").  None of Debtor's physical assets such as inventory or equipment (which assets have little to no value) will be sold as part of the transaction.

3

## II. SUMMARY OF RELIEF REQUESTED

15.    The Debtor hereby moves for the entry of an Order, pursuant to 11 U.S.C. §§ 363 and 506 and F.R.B.P. 2002, 3012, 6004, and 9014:

(a)    authorizing the Debtor's sale of the Business in accordance with the Contract, and authorizing and approving the sale, pursuant to 11 U.S.C. § 363 and F.R.B.P. 6004, free and clear of all liens, claims, and interests, with such liens, claims, and interests to attach to the net proceeds of such sale;

(b)    authorizing disbursal of the proceeds of the sale as follows:

i.    pay liens for unpaid *ad valorem* taxes assessed against the Business through the closing of the sale,

ii.    pay all usual, customary, and reasonable costs associated with the sale as agreed by the Debtor and Purchaser in the Contract;

iii.    pay to Debtor at closing the remaining net proceeds from the sale, to be further distributed in accordance with the Code's priority distribution scheme.

(c)    determining the value of the Property being sold securing the liens, if any, pursuant to 11 U.S.C. § 506(a);

(d)    granting the other relief as set forth herein.

16.    The Debtor expressly reserves the right to modify the relief requested in this Motion prior to or at any hearing that may be held concerning this Motion. Moreover, the Debtor reserves the right to remove the Property from the sale process, or seek other relief related thereto, if the Debtor determines that such actions would maximize the value of its bankruptcy estate.

### III. THE PROPOSED SALE

17.     In furtherance of its restructuring plan, the Debtor has determined that selling the Property and using the proceeds, some of which will be paid over time, to fund plan payments is in the best interest of the Debtor and its creditors. Without this sale and the revenue generated under the performance incentive (further described in Paragraph 20), the Debtor will have no ability to fund its Plan payments and creditors will receive nothing. Thus, the Debtor believes that the benefits of this sale (i.e., future revenue generation) outweigh the benefits of its continued ownership of the Property.

**A.      Sale of the Property is Warranted under Section 363.**

18.     The Debtor has determined that it would be in the best interest of its bankruptcy estate to sell the Property.

19.     A trustee's decision to sell assets is governed by the business judgment rule, whether the sale is before or after confirmation of a plan. To obtain court approval to sell property under 11 U.S.C. § 363(b), a debtor need only show a legitimate business justification for the proposed action. *See*, *e.g.*, *Committee of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Committee of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to sell property out of the ordinary course of business with a strong presumption "that in making a business decision," the debtor "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests" of the debtor. *Official Committee of Subordinated*

*Bondholders v. Integrated Resources, Inc.* (*In re Integrated Resources, Inc.*), 147 B.R. 650, 656
(S.D.N.Y. 1992). Accordingly, parties challenging a debtor's decision must make a showing of
"bad faith, self-interest or gross negligence." *Integrated Resources*, 147 B.R. at 656 (internal
citations omitted).

20.     Ample business justification exists in the instant case for the sale of the Property to
Purchaser. Specifically, the Debtor submits that selling the Property for a total purchase price of
up to $650,000.00 with $25,000.00, due Debtor at closing, and the remaining amount paid over a
five (5) year term as described in Section 2.1(b) of the Contract will provide a substantial benefit
to the estate. The quarterly incentive payment (the "**Incentive Payment**") due to Debtor on a
quarterly basis, shall be equal to 2% of the gross sales of the Purchaser for the prior quarter. Based
on Debtor's historical performance, Debtor expects the Incentive Payments to be sufficient to fund
its Plan payment obligations.

**B.      The Property Should Be Sold Free and Clear of Liens, Claims, and
          Encumbrances.**

21.     The Debtor requests authorization to sell the Property free and clear of all liens,
claims and interests, including, but not limited to, all liens, claims, and encumbrances that may be
asserted in, to, or against the Property, with such liens, claims, and encumbrances to attach to the
proceeds from the sale of the Property, including the Debtor's rights to the incentive payment
receivables, to the same extent and priority that the liens of such lienholders previously attached
to the Property. In accordance with 11 U.S.C. § 363(f), a debtor-in-possession may sell property
under 11 U.S.C. § 363(b) "free and clear of any interest in such property of an entity other than
the estate" if any one of the following conditions is satisfied:

(1)     applicable non-bankruptcy law permits sale of such
        property free and clear of such interest;

6

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *In re Elliot*, 94 B.R. 343, 354 (E.D. Pa. 1988) (because § 363(f) is written in the disjunctive - a court may approve sale "free and clear" provided that at least <u>one</u> of the subsections is met). The Debtor believes it can satisfy all of prongs (1) and (4), and, possibly prong (2).

**C.     Purchaser Should be Afforded all Protections Under 11 U.S.C. § 363(m) of the Bankruptcy Code as a Good Faith Purchaser.**

22.     11 U.S.C. § 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." 11 U.S.C. § 363(m).

23.     The Contract was the subject of extensive arm's length negotiations between the Debtor and Purchaser. The Debtor and Purchaser have operated in good faith in connection with this sale in order to ensure the Property value is maximized. Indeed, it is in the best interest of the Debtor and its estate to maximize the value of the Property so as to generate proceeds that will allow the Debtor to fund its ongoing Plan obligations. For these reasons, the Debtor requests that this Court determine that Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code. *See In re: Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986).

**D.      Payment of Sales Commissions, Closing Costs, and Other Costs Associated with the Sale.**

24.      Section 506(c) of the Bankruptcy Code provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

25.      Accordingly, the Debtor requests that it be permitted to pay the usual and customary closing fees and costs using proceeds of the sale, including outstanding ad valorem taxes, with the remaining balance of the proceeds to be paid in accordance with the Contract or Bankruptcy Code.

**E.      Determination of Secured Status of Lien Holders under 11 U.S.C. § 506(a).**

26.      The Debtor requests determination of the value of the Property being sold securing the liens, if any, of the named Respondents asserting liens in the assets to be sold as required under 11 U.S.C. § 506(a) and F.R.B.P. 3012.

**F.      Service of this Motion.**

27.      The Debtor will serve this Motion by United States First Class Mail upon: (a) the Office of the United States Trustee; (b) the twenty largest unsecured creditors; (c) the named Respondents; the Sub Chapter V Trustee, (d) other parties who have requested notice or copies of such matters in this Case; (e) all known entities holding or asserting a security interest in or lien against any of the Property to be sold; (f) all taxing authorities whose rights may be affected by the sale of the Property; and (g) all other creditors and parties-in-interest in this Case. The Debtor shall also serve any and all additional parties as the Court may direct.

**G.      Waiver of Stay Provision.**

28.      The Debtor believes that time is of the essence in closing the transaction contemplated in this Motion and requests that the Court waive the 14-day stay of any order

approving this Motion pursuant to F.R.B.P. 6004(h).

      **WHEREFORE,** the Debtor respectfully requests that this Motion be inquired into and that the same be GRANTED AND APPROVED; that this Court enter an order granting the relief requested herein; and that this Court grant such other and further relief as it deems just and proper.

      This 25th day of April 2025.

                                                **STONE & BAXTER, LLP**
                                                By:

                                                */s/ G. Daniel Taylor*
                                                David L. Bury, Jr.
                                                Georgia Bar No. 133066
                                                G. Daniel Taylor
                                                Georgia Bar No. 528521

577 Third Street
Macon, Georgia 31201
(478) 750-9898; (478) 750-9899 (fax)
dbury@stoneandbaxter.com
dtaylor@stoneandbaxter.com                        Counsel for Debtor

G:\CLIENTS\Perfectly Priscilla, LLC\Sale of Assets\Sale Motion (Final for Upload).docx

9

## **Exhibit A**

**Asset Purchase Agreement Dated January 20, 2025**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**AVENUE SHOPS, LLC**

**(the Purchaser)**

**AND**

**PERFECTLY PRISCILLA LLC**

**(the Company or Seller)**

**AND**

**THOMAS THOMPSON AND DEIDRE ALLISON THOMPSON**

**(Owner)**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "*Agreement*"), effective for all purposes as of January 27, 2025 (the "*Effective Date*"), is entered into by and among Avenue Shops, LLC, a Delaware limited liability company (the "*Purchaser*")on the one hand, and Perfectly Priscilla LLC, a Georgia limited liability company (the "*Company,*" or the "*Seller*"), and Thomas Thompson, an individual, and Deidre Allison Thompson, an individual (collectively, the "*Owner*"), on the other hand.  The Company and Owner are sometimes referred to hereinafter individually as a "*Seller Party*," and collectively as the "*Seller Parties*."  The Purchaser and the Seller Parties are sometimes referred to hereinafter individually as a "*Party*," and collectively as the "*Parties*."

## RECITALS:

A.    Owner collectively owns 100% of the membership interest in the Company such that Thomas Thompson and Deidre Allison Thompson each owns 50% of the membership interest in the Company, and the Company conducts a retail company which is a women's clothing boutique store (the "*Purchased Business*").

B.    Seller desires to sell, and the Purchaser desires to Purchase, certain assets of the Company (the "*Asset Purchase*"), including, but not limited to certain contractual rights, all as set forth in this Agreement.

C.    The Company has filed for bankruptcy protections under applicable law, and the Parties therefore desire to conduct the Asset Purchase pursuant to Section 363 of the Federal Bankruptcy Code ("*Section 363*"), including obtaining all approvals necessary to effectuate the Asset Purchase.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT:

1.    **Assets**.

1.1.    Transfer of Title to Assets.  At the Closing (as defined below), and in accordance with the terms and conditions of this Agreement, Seller hereby sells, conveys, transfers, and assigns to the Purchaser all right, title and interest of the Company or Owner, as the case may be, in and to all of the Assets used in the Purchased Business, including, but not limited to, those assets listed on Schedule 1.1 hereto (collectively with the Related Claims and Ancillary Rights (each as defined below), the "*Assets*"), free and clear of any liens, claims, mortgages, pledges, security interests, charges, restrictions or encumbrances of any kind (collectively, "*Encumbrances*").  Notwithstanding the foregoing, Seller shall retain, and not sell to Purchaser, the Retained Assets referenced in Section 1.3 below.

1.2.    <u>Acquisition of Related Claims and Ancillary Rights</u>.

(a)    <u>Acquisition of the Claims</u>.  In addition, Seller hereby assigns to the Purchaser all right, title and interest in and to any and all claims, liabilities, and demands owed to Seller of any kind and character, whether known or unknown, or hereinafter discovered, fixed or contingent, whether in law or in equity, relating to or pertaining to the Assets free and clear of any Encumbrances (each a "***Related Claim***" and collectively, the "***Related Claims***").

(b)    <u>Acquisition of Ancillary Rights</u>.  In addition, Seller hereby assigns to the Purchaser all right, title and interest in and to any and all rights, privileges, and other benefits of any kind and character, whether known or unknown, or hereinafter discovered, fixed or contingent, whether in law or in equity, that relate or pertain to the Assets, free and clear of any and all liens, claims or Encumbrances of any kind (each an "***Ancillary Right***" and collectively, the "***Ancillary Rights***")

1.3.    <u>Retained Assets</u>.  The Seller shall retain and does not sell to Purchaser any of the assets listed on <u>Schedule 1.3</u> (the "***Retained Assets***").

1.4.    <u>No Liabilities Assumed</u>.  The Purchaser shall not assume, and nothing contained in this Agreement shall be construed as an assumption by the Purchaser of, any liabilities, obligations or undertakings of any of the Seller Parties of any nature whatsoever, whether accrued, absolute, fixed or contingent, known or unknown due or to become due, unliquidated or otherwise, including, but not limited to, any accounts payable due to any current or previous owner of the Company, including, but not limited to, the Owner, or to any other affiliate or third party.

1.5.    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "***Closing***") will take place at a time and place agreed upon by the Parties, and shall be effective for all purposes as of the Closing Date, after all conditions precedent set forth in Section 5 hereof have been satisfied or waived by the party entitled to the benefit of such condition, or at such other place and on such other date as is mutually agreeable to the Parties.  The date on which the Closing occurs is referred to herein as the "***Closing Date***," and the Closing shall be deemed effective as of 12:01 a.m., Utah time, on the Closing Date.

1.6.    **Proration of Taxes**.  All Taxes, as defined in Section 3.7 below, that are applicable to the Assets and the Purchased Business that relate to tax years or periods ending prior to the Closing Date shall be the responsibility of Seller.  All Taxes that are applicable to the Assets and the Purchased Business that relate to tax years or periods beginning on or after the applicable Closing Date shall be the responsibility of Purchaser.  All other Taxes applicable to the Assets and the Purchased Business that relate to tax years or periods beginning prior to the Closing Date and ending after the Closing Date shall be prorated between Seller and Purchaser based on days or some other reasonable allocation method that takes into account the basis upon which such Taxes are assessed, with Seller responsible for any such items attributable to periods prior to the Closing Date and Purchaser responsible for any such items attributable to periods on and after the Closing Date.  To the extent possible, Seller and Purchaser will attempt to estimate the amount of any Taxes in need of proration on the Closing Date by taking into account, among other

3

Docusign Envelope ID: 8AA5D847-45D6-4916-93BF-64421DFE7E7C

things, any prior period Tax bills.  To the extent the Parties are not able to make such estimates as of the Closing Date, or to the extent the Closing Date estimates are subsequently revised based on final tax amounts becoming known, any amounts owed by one Party to the other Party will be paid within 30 days of such determination.

2.      **Purchase Price; Allocation of Purchase Price.**

2.1.    <u>Purchase Price</u>.  Subject to Sections 5 and 6 below, and the other terms and conditions herein, the aggregate possible purchase price to be paid by the Purchaser to the Company for the Assets shall be $650,000.00 (the "***Purchase Price***").  The Purchase Price shall be paid as follows:

(a)      An initial payment of $25,000.00 (the "***Initial Payment***") due to Seller on the Closing Date by wire transfer, cashier's check, or otherwise in immediately available funds.

(b)      A conditional performance incentive (the "***Incentive***") due to Seller on the fifteenth (15th) day of the first month of each quarter equal to two percent (2%) of gross revenue for the prior quarter, for a period of five (5) calendar years commencing on the Closing Date; provided that the Incentive shall be limited to a maximum equal to no more than $625,000.00 and conditioned on achieving gross revenue. Purchaser agrees to provide sales audit rights to Seller in the form of (i) read-only access to sales tracking software platforms used for the Purchased Business and (ii) monthly sales reports delivered on the 15th day of the following month.

Notwithstanding the foregoing, the Purchaser shall have its rights of setoff set forth under Section 8.3 below.

2.2.    <u>Allocation of Purchase Price</u>.  The Purchase Price shall be allocated among the Assets as set forth on <u>Schedule 2.2</u>, all as required by Section 1060 of the Internal Revenue Code of 1986, as amended, and that allocation shall be reported by both the Purchaser and the Seller on Internal Revenue Service Form 8594, Asset Acquisition Statement, which will be filed with the Purchaser's and Seller's Returns (as defined below) for the tax year that includes the period immediately preceding the Closing Date.  The allocation set forth on <u>Schedule 2.2</u> shall be conclusive and binding upon the Parties for all purposes, and none of the Parties shall file any Returns (as defined below) return or other document with, or make any statement or declaration to, any governmental authority that is inconsistent with such allocation.  If the Purchase Price is adjusted, then <u>Schedule 2.2</u> shall be revised to reflect such adjustment in a manner mutually acceptable to the Purchaser and the Seller.

3.      <u>**Representations and Warranties of the Seller Parties**</u>.  Each of the Seller Parties jointly and severally represents and warrants to the Purchaser the following as of the Closing Date:

Docusign Envelope ID: 5AA50845-15D6-4916-93BF-64424DFEFE7C

3.1.    Existence; Authority.

(a)    The Company is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Georgia. The Company has the full power to carry on the Purchased Business as now being conducted and to own and operate the Assets and property owned, leased and operated by it.

(b)    The Company has the right, power, legal capacity and authority to enter into and perform its obligations under this Agreement and all other agreements executed in connection herewith and all exhibits and schedules hereto, and none of the Seller Parties has sold, assigned, or otherwise transferred or encumbered (directly or indirectly) any portion of the Assets to any person or entity whatsoever. Provided, however, that Seller's obligations pursuant to this Agreement are subject to final approval from the United States Bankruptcy Court for the Middle District of Georgia related to Seller's ongoing bankruptcy case (the "***Bankruptcy Case***").

(c)    This Agreement and all other agreements executed in connection herewith and all other exhibits and schedules hereto are valid and binding obligations of the Seller Parties, enforceable in accordance with their respective terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies.

(d)    Owner is the owner of the membership interests in the Company, and Owner has not pledged, encumbered, or agreed to sale or assign such membership interests in the Company.  There are no options, warrants, or other rights, agreements, arrangements, or commitments to which any Seller Party is a party of any character relating to the issuance of any equity securities in the Company, or to a sale, assignment, pledge, lease, encumbrance or license of the Assets.

(e)    This Agreement has been duly executed and delivered by each of the Seller Parties.  This Agreement and each of the exhibits are, or when duly executed and delivered by the Seller Parties shall be, valid and binding obligations of the Seller Parties, enforceable against the Seller Parties in accordance with their respective terms.

3.2.    Consents.  No consent of any person not a party to this Agreement and except for the bankruptcy court, no consent of any governmental authority is required to be obtained on the part of any Seller Party to permit the consummation of the transactions contemplated by this Agreement, including without limitation the transfer to the Purchaser of all right, title and interest in and to the Assets, free and clear of any Encumbrances of any nature whatsoever, whether, direct or indirect, accrued, absolute, contingent or otherwise.

3.3.    Assets.

(a)    Schedule 1.1 to this Agreement is complete and the Assets are located at the Company's principal place of business.  Included in the Assets are all the tangible assets, intangible assets, contract rights and permits necessary for the use by the Purchaser of the

Assets in the manner such Assets were used by the Seller in the Purchased Business as it was historically conducted.

(b)    All tangible personal property included in the Assets is in good operating condition and repair, ordinary wear and tear excepted. None of Owner, or any employee or affiliate of the Company, nor any spouse, child or other relative of any of these persons, owns, or has any interest, directly or indirectly, in any of the personal property included in the Assets.

(c)    The Company is the owner of, and has good and marketable title to, the entire right, title and interest in and to the Assets, as defined below, and at the Closing shall transfer such Assets to Purchaser free and clear, from any and all Encumbrances of any nature whatsoever.  The Company has the sole right and authority to grant the rights that are granted to the Purchaser hereunder.  The Seller Parties also warrant that no assignment, sale or Encumbrance has been or will be entered into, or will arise by the transfer of the Assets hereunder to the Purchaser, which would conflict with this Agreement in any way.

(d)    The Assets constitute all of the assets, properties, rights and intellectual property rights that are necessary or desirable to enable the Purchaser, following the Closing, to own, conduct, operate and continue the Purchased Business as historically conducted and to sell and otherwise enjoy full rights to commercial exploitation of products and services that are provided in connection with the Assets and the Purchased Business without:  (i) the need for the Purchaser to acquire or license any other asset, property or intellectual property right; and (ii) the breach or violation of any contract or commitment.  None of the Assets is licensed or leased from any third party, and no royalties, license fees or similar payments are due or payable (or may become due or payable) to any third party under any license, lease or other agreement of, to or affecting the Assets.

(e)    Notwithstanding anything to the contrary contained in this Agreement, the Company hereby expressly disclaims any representation or warranty of any kind related to condition of the Assets, whether express or implied, including, but not limited to, any representations or warranties concerning the merchantability of the Assets, the fitness of the Assets for a particular purpose, or the compliance of the Assets with applicable laws or regulations. Buyer expressly acknowledges that it is acquiring the Assets on an "as is, where is" basis.

3.4.    <u>Financial Statements</u>.  <u>Schedule 3.4</u> consists of the following financial statements of Seller (the "***Financial Statements***") the unaudited balance sheet and income statement of Seller (i) as of and for the fiscal year ending December 31, 2023, and (ii) as of and for the period beginning January 1, 2024, and ending May 31, 2024 (the "***Most Recent Balance Sheet Date***").  The Financial Statements (i) are true, complete, correct and consistent with the books and records of Seller, (ii) fairly present the results of operations of Seller for the periods ended on the respective dates of the statements contained therein, and (iii) have been uniformly prepared and consistently applied for all periods.

3.5.    <u>Absence of Changes</u>.  Since the Most Recent Balance Sheet Date Seller has operated the Purchased Business in a limited capacity and not in accordance with past

Docusign Envelope ID: 9AA5D845-15D6-4916-93BF-64421DFEFE7C

practice.  Since that date, there has not been any change, development, event or circumstance which might reasonably be expected to result in a material adverse change, in the assets, liabilities, , prospects or business relationships of the Purchased Business. Without limiting the generality of the foregoing, since the Most Recent Balance Sheet Date, there has not been with respect to Seller or the Purchased Business any:

(a)    waiver, release, cancellation or compromise of any debts owed to it or claims or rights against others exceeding $5,000 in the aggregate;

(b)    act or omission by Seller, not in the ordinary course of business, whether through change in practice with respect to the timing of payment of accounts payable, the timing of collection of accounts receivable, the rate of purchase of inventory or the modification by Seller of the pricing of the products or services of the Purchased Business;

(c)    purchase or lease of (or commitment to purchase or lease) any assets (other than inventory) in excess of $5,000 individually or $20,000 in the aggregate;

(d)    damage, destruction or loss (whether or not covered by insurance) to any property having a value in excess of $5,000 and primarily used in connection with the operation of the Purchased Business;

(e)    sale or disposition of any asset of Seller having a value in excess of $5,000, other than the sale of inventory in the ordinary course of business;

(f)    unusual or novel method of operating the Purchased Business or any change in any Seller's accounting procedures or practices in respect of the Purchased Business;

(g)    failure to maintain the equipment and machinery among the Assets in reasonably good repair (subject to ordinary wear and tear); or

(h)    any agreement or commitment, other than this Agreement, to do any of the foregoing.

Notwithstanding the foregoing, the Parties acknowledge that Company has filed for Chapter 11 bankruptcy under the applicable bankruptcy code.

3.6.    No Undisclosed Liabilities.  Seller has no liability except for the liabilities reflected or reserved against on the Financial Statements and current liabilities incurred in the ordinary course of business of Seller since the date of the Most Recent Balance Sheet Date.

3.7.    Taxes.  The Company has timely filed within the time period for filing or any extension granted with respect thereto all federal, state, local and other returns, estimates and reports ("*Returns*") relating to any and all taxes of whatever kind or other governmental charges, obligations, fines, deficiencies, assessments or fees including any secondary or transferee liability for taxes and any related interest or penalties ("*Tax*" or "*Taxes*") it is required to file with respect to the Assets and the Purchased Business, and such Returns were true and correct in all material respects when filed and were completed in accordance with applicable law. The Seller has paid or will pay in connection with the

transactions contemplated in this Agreement all Taxes they are required to pay with respect to the Assets and the Purchased Business. There are no pending or threatened audits, examinations, assessments, asserted deficiencies or claims for additional Taxes with respect to the Assets or the Purchased Business. There are no liens or similar Encumbrances relating to or attributable to Taxes on the Assets or the Purchased Business. There are no claims relating to Taxes that, if adversely determined would result in a lien or similar Encumbrance on the Assets or the Purchased Business or otherwise adversely affect the Purchaser For purposes of this Section references to the Company include any predecessor or transferor of the Company.

3.8.    Restrictions on Business Activities. There are no agreements (whether a noncompete agreement, nondisclosure agreement or otherwise), commitment, judgment, injunction, order or decree to which any Seller Party is a party or which is otherwise binding upon any Seller Party which has or may have the effect of prohibiting or impairing any business practice of the Company (as presently conducted), any acquisition of property (tangible or intangible) by the Company or the conduct of business by the Company (as presently conducted) which would have an adverse effect on the Purchased Business or the Assets. Without limiting the foregoing, none of the Seller Parties has entered into any agreement under which he/it is restricted from selling, licensing or otherwise operating the Purchased Business, using the Assets or providing services to, customers or potential customers or any class of customers, in any geographic area, during any period of time or in any segment of the market.

3.9.    Assigned Contracts. Schedule 1.1 provides an accurate description of each oral or written contract and commitment to provide services being assigned to the Purchaser hereunder (each an "***Assigned Contract***," collectively, the "***Assigned Contracts***").   Each of the Assigned Contracts is in full force and effect, and none of the Seller Parties or any other party thereto, is in breach or violation of, or default under, nor is any Seller Party aware of any reasonable basis for a claim of such breach or violation of, or default under, the terms of any Assigned Contract, and no event has occurred which constitutes or, with the lapse of time or the giving of notice or both, would constitute a breach or violation of, or default under, any Assigned Contract by any Seller Party, or to the knowledge of any Seller Party, any other party thereto. There is no anticipated or threatened default or material failure of performance or observance of any obligations or conditions contained in the Assigned Contracts by any Seller Party, or, to the knowledge of any Seller Party, by any other party thereto. None of the Seller Parties or any other party to any Assigned Contract has provided any notice of default or notice of its intention to terminate any of the Assigned Contracts, nor, to the knowledge of any Seller Party, does any party to any Assigned Contract intend to terminate such Assigned Contract.

3.10.    Litigation.  There is no suit, action, litigation or other proceeding or governmental or administrative investigation or inquiry pending or, to any Seller Party's knowledge, threatened against any of the Seller Parties or the Assets, other than the Bankruptcy Case.

3.11.    Brokerage.  No third party shall be entitled to receive any brokerage commissions, finder's fees, fees for financial advisory services or similar compensation in connection

with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of any Seller Party.

3.12.    Customers and Vendors.  Schedule 3.12 sets forth (a) the names and addresses of all customers and vendors of the Seller that ordered services from the Seller or provided services or goods to the Seller during the twelve-month period ended May 31, 2024.  The Seller has not received any notice or has any reason to believe that any such customer or vendor of the Seller (i) has ceased, or will cease, to use the services of the Seller or to provide services or goods to the Seller; (ii) has substantially reduced or will substantially reduce, the use of services of the Seller or the provision of services or goods to the Seller; or (iii) has sought, or is seeking, to reduce the price it will pay for services of the Seller or charge for providing services or goods to the Seller, including in each case after the consummation of the transactions contemplated hereby. To the best knowledge of the Seller Parties, no customer or vendor of the Seller described in clause (a) of the first sentence of this Section has otherwise threatened to take any action described in the preceding sentence as a result of the consummation of the transactions contemplated by this Agreement. Seller represents and warrants that the transfer of Assets, including, but not limited to the list of customers described in Schedule 3.12, do not violate Seller's privacy policy, if applicable, nor any other policy of Seller in effect as of the Effective Date.

3.13.    Employees, Labor Matters, etc.  Except as set forth in Schedule 3.13, the Seller is not a party to and is not bound by any collective bargaining agreement and there are no labor unions or other organizations representing, purporting to represent or attempting to represent any employees employed in the operation of the Purchased Business.  There are no labor disputes currently subject to any grievance procedure, arbitration or litigation and there is no representation petition pending or, to the best knowledge of any Seller Party after due inquiry, threatened with respect to any employee employed in the operation of the Business.  Each Seller Party has complied with all provisions of all applicable law pertaining to the employment of employees, including, without limitation, all such laws relating to labor relations, equal employment, fair employment practices, entitlements, prohibited discrimination or other similar employment practices or acts, except for any failure so to comply that, individually or together with all such other failures, has not and will not result in a material liability or obligation on the part of the Purchaser or the Purchased Business.

3.14.    Compliance with Laws; Governmental Approvals and Permits.  The Seller has complied in all material respects with all applicable laws applicable to the Purchased Business and the Assets, and the Seller has not received any notice alleging any such conflict, violation, breach or default.  Schedule 3.14 sets forth all governmental approvals, permits and licenses necessary for, or otherwise material to, the conduct of the Purchased Business.  All such governmental approvals, permits and licenses have been duly obtained and are in full force and effect, and the Seller is in compliance with each of such governmental approvals, permits and licenses held by it with respect to the Assets and the Purchased Business.

3.15.    Representations Complete.

Docusign Envelope ID: 9AA50845-45D6-4916-93BF-64421DFEF57C

(a)     None of the representations and warranties made by any Seller Party herein or in any exhibit, schedule or certificate furnished by any Seller Party, or on its/his behalf, pursuant to this Agreement, contains or will contain any untrue statement of a material fact, or omits to state any material fact required to be stated therein or necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

(b)     There are no facts or developments of any kind existing as of the date of this Agreement, which would materially and adversely affect the business, operations, prospects, relationships with customers or suppliers, properties, assets or financial condition of the Purchased Business or the Assets.

4.      **Representations and Warranties of the Purchaser**.  As of the Closing Date, the Purchaser represents and warrants to the Seller as follows:

4.1.    Existence; Authority.  The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and corporate authority to consummate the transactions contemplated herein.  This Agreement, and the transactions contemplated herein, have been duly authorized by all necessary corporate action on the part of the Purchaser.

4.2.    Valid and Binding Agreement.  This Agreement, and any other documents required to be executed by the Purchaser at Closing, will, when duly executed and delivered by the Purchaser, constitute valid and binding obligations of the Purchaser.

4.3.    Brokerage.  No third party shall be entitled to receive any brokerage commissions, finder's fees, fees for financial advisory services or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Purchaser.

5.      **Conditions Precedent to the Purchaser's Obligations**.  All obligations of the Purchaser under this Agreement are subject to the fulfillment, either prior to or at the Closing Date, of the following conditions:

5.1.    Assets.  The Seller shall deliver the Assets to the Purchaser at the Closing.

5.2.    Consents.  Seller shall have obtained and shall have delivered to the Purchaser all governmental approvals and all consents (including, without limitation, all consents required by the bankruptcy court or under any Assigned Contract) necessary to be obtained in order to consummate the sale and transfer of the Assets pursuant to this Agreement.

5.3.    Assignment of Proprietary Information and Inventions.  Unless otherwise agreed by the Purchaser, each employee of the Company, including, but not limited to Owner, shall have executed and delivered to the Company a Proprietary Information and Inventions Agreement in form and substance acceptable to Purchaser, whereby all proprietary information and inventions pertaining to the Purchased Business have been assigned to the Company.

Docusign Envelope ID: 9AA508AF-F5D6-4916-93BF-64421DFEFE7C

5.4.    <u>Objections</u>. Notwithstanding the foregoing, the Closing Date may be delayed until the later of:

(a)     If no objection is filed with the bankruptcy court, the expiration of the 14-day appeal period after entry of the sale order pursuant to Fed. R. Bankr. P. 6004(h), unless the bankruptcy court waives such period in the sale order; or

(b)     If an objection is filed during the appeal period, the entry of a final appellate decision affirming the bankruptcy court's denial of the objection.

5.5.    <u>Bidding Procedures</u>. The Parties agree to cooperate in good faith with each other to negotiate and draft bidding procedures pursuant to Section 363 that shall be mutually agreeable to the Parties and approved by the bankruptcy court (the "***Bidding Procedures***"), which shall be attached hereto as <u>Exhibit B</u> and incorporated by reference herein.

5.6.    <u>Bankruptcy Court Approval</u>. The Parties agree to cooperate in good faith with each other in obtaining any and all orders granted by the bankruptcy court necessary to approve the sale and the Bidding Procedures, as applicable (the "***Court Orders***"). The Court Orders shall be attached and incorporated by reference herein as <u>Exhibit C</u>.

6.    **Deliveries of the Seller at Closing. Prior to or at the Closing**.

6.1.    The Seller Parties shall execute the General Assignment and Bill of Sale that is attached hereto as <u>Exhibit A</u>, the purpose of which is to transfer all of the Seller Parties' right, title and interest in and to the Assets, to the Purchaser.

6.2.    The Seller Parties shall obtain bankruptcy court approval of the Asset Purchase and Bidding Procedures, and deliver certified copies of all court orders to the Purchaser.

6.3.    The Seller Parties shall cure any and all defaults on executory contracts and leases, as applicable, being assumed by the buyer.

6.4.    The Seller Parties shall provide all required notices to parties in interest, including but not limited to creditors of the Company, and shall further comply with Section 363 and all related requirements necessary or otherwise desirable to effectuate the Asset Purchase.

6.5.    The Seller Parties shall deliver the items listed in Section 5 hereof to the Purchaser.

7.    **Deliveries of the Purchaser at Closing**.  Prior to or at the Closing the Purchaser shall deliver to the Company either by electronic funds to an account specified in writing by the Company or by certified check to an address specified in writing by the Company funds equal to the Initial Payment.

8.    **Survival and Indemnification; Legal Proceedings**.

8.1.    <u>Survival and Indemnification</u>.  The covenants, representations and warranties contained in this Agreement shall survive the Closing for a period of nine (9) months. Each of the Seller Parties agrees to jointly and severally indemnify the Purchaser with respect to, and hold the Purchaser harmless from, any loss, liability or expense (including, but not limited to, reasonable legal fees and costs) which the Purchaser may directly or indirectly incur or suffer by reason of, or which results, arises out of or is based upon (a) the inaccuracy of any representation or warranty made by any of the Seller Parties in this Agreement, or (b) the failure of any Seller Party to comply with any covenants or other commitments made by any of such Seller Parties in this Agreement.  The Purchaser agrees to indemnify each of the Seller Parties with respect to, and hold the Seller Parties harmless from, any loss, liability or expense (including, but not limited to, reasonable legal fees and costs) which any Seller Party may directly or indirectly incur or suffer by reason of, or which results, arises out of or is based upon the (a) the inaccuracy of any representation or warranty made by the Purchaser in this Agreement, or (b) the failure of the Purchaser to comply with any covenants made by the Purchaser in this Agreement.

8.2.    <u>Legal Proceedings</u>.  In the event that the Purchaser or any Seller Party becomes involved in any legal, governmental or administrative proceeding, which may result in indemnification claims hereunder, such Party shall promptly notify the other Party or Parties in writing and in full detail of the filing, and of the nature of such proceeding.  The other Party or Parties may, at their sole option and expense, defend any such proceeding if the proceeding could give rise to an indemnification obligation hereunder.  If the other Parties elect to defend any proceeding, then they shall have full control over the conduct of such proceeding, although the Party or Parties being indemnified shall have the right to retain legal counsel at its own expense and shall have the right to approve any settlement of any dispute giving rise to such proceeding, provided that such approval may not be withheld unreasonably by the party being indemnified.  The Party or Parties being indemnified shall reasonably cooperate with the indemnifying party in such proceeding.

8.3.    <u>Transaction Fees</u>.  Notwithstanding the foregoing, within 15 business days following the consummation of a transaction for the Assets, or substantially all of the Assets, to a purchaser other than Purchaser (a "***Third Party Sale***"), the Seller Parties shall be liable for immediate payment of the following fees to Purchaser:

(a)    3% of the Purchase Price, which is equal to the amount of $18,000 (the "***Break-Up Fee***");

(b)    An amount equal to all expenses and costs incurred by Purchaser in connection with negotiating this Agreement, due diligence, the Section 363 bidding process, and all related matters, including all attorneys' fees (the "***Expense Reimbursement Fee***"); and

(c)    An amount equal to 3% of the difference between (i) the Purchase Price, and (ii) the total purchase price and any other consideration due to, or received by, any of the Seller Parties arising out of a Third Party Sale (the "***Topping Fee***").

9.      **Covenants of Owner**.

    9.1.  <u>Reserved</u>.

    9.2.  <u>Nonsolicitation</u>.  For the period beginning as of the Closing Date and ending three (3) years thereafter (the "***Noncompetition Period***"), none of the Seller Parties shall, directly or indirectly, recruit, solicit, induce, or influence (or seek to induce or influence) any person who is employed by, hired by, affiliated with, or acts as a consultant, independent contractor, or service provider, of the Company to terminate or alter his/her/its relationship with the Company.  Except as permitted by the Purchaser in writing during the Noncompetition Period, none of the Seller Parties shall, directly or indirectly, call on or solicit any person, firm, corporation, business or other entity who or which is, or had been within the prior two years, a customer or potential customer, or supplier or potential supplier, of the Company as of the Closing, as the case may be.

    9.3.  <u>Injunctive Relief</u>.  The Seller Parties agree that the amount of damage resulting to the Company and the Purchaser from a violation of this Section 9 is difficult to ascertain.  Therefore, the Company and the Purchaser shall also be entitled to equitable relief, including, but not limited to, an injunction, and such relief shall be cumulative and in addition to any other remedies that the Company and the Purchaser may have hereunder and/or at law or in equity; and the Seller Parties agree not to assert as a defense in any such equitable proceeding that an adequate remedy at law exists.

10.     **Expenses**.  Except as otherwise provided in this Agreement, each Party shall bear its own costs and expenses in connection with this Agreement.  For example, each Party shall pay the cost of its attorney to review this Agreement.

11.     **Further Actions and Assurances; Certain Covenants**.

    11.1.  <u>General</u>.  The Parties shall execute and deliver any and all documents and shall cause any and all action to be taken, either before or after Closing, which may be reasonably necessary or proper to effect or evidence the provisions of this Agreement and the transactions contemplated hereby.

    11.2.  <u>Name Change</u>.  Within five (5) business days after the Closing Date, the Parties shall cooperate in good faith and prepare and deliver to the Purchaser such letters, applications and other documentation required by the Delaware Division of Corporations (the "***Division***"), which Purchaser shall file with the Division of behalf of the Seller and the Purchaser, in order to permit (i) the Purchaser to change its name to, or otherwise obtain the dba of, "Perfectly Priscilla LLC", and (ii) the Seller shall change its entity name to such other name desired by Seller; *provided*, *however*, that such name shall be approved in advance by the Purchaser in its reasonable discretion.

    11.3.  <u>Operating the Purchased Business</u>.  Purchaser agrees to use commercially reasonable Best Efforts to continue to operate the Purchased Business in the ordinary course of business following the Closing Date until the earlier of (a) Purchaser's substantial performance of the payment obligations under Section 2 hereunder; or (b) the

occurrence of a Material Adverse Effect with respect to the Purchased Business. For purposes of this Section 11.3:

"Best Efforts" means using marketing and sales processes consistent with Purchaser's own business, allowing for a period of no less than two (2) months from the Closing Date for Purchaser to integrate the Purchased Business into Purchaser's own processes.

"Material Adverse Effect" means circumstances that substantially undermine the viability of the Purchased Business, including without limitation (i) the Purchased Business's failure to achieve profitability for three (3) or more months; (ii) major regulatory changes impacting the industry; and (iii) supply chain issues.

11.4.    Employment.  As of and after the Closing Date, Purchaser may, but is not obligated, to interview and hire any employees previously employed by the Company.

11.5.    Tax Clearance Certificate.  Within ten (10) days following the Closing Date the Seller shall file Form TC-2001 with the Utah State Tax Commission in order to obtain a tax clearance certificate that evidences that Seller owes no past-due taxes, penalties or fees to the State of Utah. Seller shall file and deliver similar such tax clearance certificates in any other jurisdictions, including the State of Georgia, which may be required by Purchaser prior to Closing.  Upon receipt of such tax clearance certificate(s), the Seller shall promptly deliver such certificate(s) to the Purchaser.

11.6.    Consulting. Seller will remain available as needed by request of the Buyer for up to two months following the Closing Date to assist in a smooth transition of the Purchased Business' operations and customer accounts.

12.    **Counterparts; Facsimile**.  This Agreement may be executed in one or more counterparts each of which shall be deemed an original all of which together shall constitute one and the same instrument.  Each Party may sign this Agreement and transmit the signature page containing the original signature by facsimile machine to the other Party.

13.    **Contents of Agreement; Parties in Interest**.  This Agreement, the exhibits and the schedules hereto set forth the entire understanding of the Parties.  Any previous agreements or understandings between the Parties regarding the subject matter hereof are merged into and superseded by this Agreement.  All representations, warranties, covenants, terms, conditions, and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the respective Parties.

14.    **Governing Law; Venue; Attorneys' Fees**.  This Agreement is to be construed and enforced in accordance with the laws of the State of Georgia.  The Parties agree to submit to the exclusive jurisdiction and venue of state and federal courts located in Berrien County,  Georgia.  The Seller hereby covenants and agrees not to bring suit in any jurisdiction other venue other than in the Berrien County, Georgia.  In the event litigation is initiated to interpret or enforce this Agreement, the Party prevailing in such litigation shall be entitled to reasonable attorneys' fees and costs in addition to any other relief granted by the court.

15.    **Notices**.  All notices which are required or permitted under this Agreement shall be sufficient if given in writing and delivered personally or by registered or certified mail, postage prepaid as follows:

If to the Purchaser:

AVENUE SHOPS, LLC
Attn:  Glen Womble
2575 W 400 N
Suite 300
Lindon, UT 84042

With a copy to (which shall not constitute notice):

Josh Freeman
FREEMAN LOVELL, PLLC
9980 S 300 W, Suite 200
Sandy, Utah 84070

If to Seller:

Thomas Thompson
173 Southside Dr.
Nashville, GA 31639

Deidre Thompson
2880 Green Meadow Dr.
Valdosta, GA 31601

With a copy to (which shall not constitute notice):

[Seller's Counsel]
_____
_____
_____

16.    **Advisors**.  Each Party represents to the other Party that it has consulted legal, financial, and tax advisors and/or counsel to advise it as to the legal, financial, and tax effect of this transaction.  The Seller Parties acknowledge that the law firm of Freeman | Lovell, PLLC has and continues to only represent the Purchaser, and not any of the any of the Seller Parties.

17.    **Use and Property Taxes**. The Parties hereby agree that they shall pay equally sales and use taxes, if any, arising out of the transfer of the Assets and shall pay their respective portion prorated, as of the Closing, of state and local personal property taxes in connection with the purchase and sale of the Assets.

***[Signature Page Follows]***

15

**IN WITNESS WHEREOF**, the Parties have executed this Agreement to be effective for all purposes as of the Closing Date.

<u>**SELLER**</u>:

PERFECTLY PRISCILLA LLC

By: *Thomas Thompson* 1/27/2025

Name:     Thomas Thompson

Title:      Manager

*Deidre Thompson*   1/27/2025

Deidre Allison Thompson, an individual

<u>**PURCHASER**</u>:

AVENUE SHOPS, LLC

By: *Glen Womble*   1/28/2025

Name:     Glen Womble

Title:      Manager